FILED
08/11/2022
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
### May 11, 2022 Session

## STATE OF TENNESSEE v. PHILLIP MYRON LOOPER

### Appeal from the Criminal Court for Sumner County
### No. 822-2019         Dee David Gay, Judge

_____

### No. M2021-00652-CCA-R3-CD

_____

The Defendant, Phillip Myron Looper, pleaded guilty to two counts of aggravated animal cruelty and one count of aggravated assault. The trial court sentenced the Defendant to 364 days to be served in the county jail, followed by twelve years of probation, including a restriction from leaving the county of residence except for medical treatment. The Defendant did not object to the sentence but filed a timely appeal, contending that the trial court erred when it imposed a sentence in excess of the agreed upon five years and by improperly imposing travel restrictions. After review, we reverse the trial court's judgments and remand the case for entry of an order as set forth herein.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

J. Alexander Little, IV, Nashville, Tennessee (on appeal), Roland F. Mumford, Hendersonville, Tennessee (at hearing and on appeal), and Jefre S. Goldtrap, Nashville, Tennessee (at hearing), for the appellant, Phillip Myron Looper.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Ray L. Whitley, District Attorney General; and Daniel Ray Daugherty, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Petitioner's shooting in Sumner County, Tennessee, of two dogs at the home of a person not known to him, but who was present at the time of the shooting.

## A. Guilty Plea

On December 14, 2020, the trial court held a hearing during which the Defendant offered his plea of guilty to two counts of aggravated animal cruelty and one count of aggravated assault. During the hearing, the Defendant testified that he was sixty-eight years old, had graduated from high school, and was entering his plea of his own free will with no promises made to him.

The trial court informed him that, as he was pleading guilty to aggravated assault, his sentence could be between three and six years, to be served at thirty percent. The trial court said that, pursuant to the agreement, "the number of years that I can impose is capped at five years; do you understand?" He reminded the Defendant that the trial court would determine his sentence after a sentencing hearing and that the trial court would determine if the Defendant would serve his sentence, all or part, in confinement or on probation. The trial court informed the Defendant that his guilty plea to aggravated animal cruelty, a class E felony, carried a sentencing range of one to two years. The trial court said he would also determine at the sentencing hearing, "whether or not these convictions can be expunged . . . ."

When asked if he was on medication, the Defendant said that he was taking Risperdal but that it did not affect his understanding or decision-making. The trial court agreed that the Defendant was well-oriented, responsive, understood the questions, and seemed to understand the agreement.

The trial court reviewed the Defendant's rights with him, and the Defendant acknowledged understanding those rights. The trial court also ensured that the Defendant understood that he could not contact the victim or be near her home, with the understanding that the victim had brought civil suit against the Defendant, so they would be together with their attorneys present for proceedings relevant to the civil lawsuit. As a further condition, the Defendant was required to surrender all his firearms and was not allowed to own another firearm. The State then offered the following recitation of facts:

> [T]he facts in this case as the State would present them would be that [on June 18, 2019] . . ., responding officers with the sheriff's department were assigned an investigation involving an unidentified white male who drove to [an address on] Anderson Road in Hendersonville, Tennessee. The unidentified male got out of the [white] truck . . . and shot one dog on the porch and shot a second dog in the driveway.

2

The victim who had called this in, Diana Spisak, stated that she witnessed the unidentified male with the dogs and he had a handgun. She stated that the male walked to his truck and retrieved a shotgun and then walked on the porch and began knocking at her residence. The dogs belonged to Ms. Spisak. She relayed to 911 and stated that this male was going to kill her and the deputies responded. By the time the deputies got there, the unidentified male was gone. A property watch was placed on this residence and a TBI agent responded and drafted a sketch of the unidentified male.

Later Sergeant Schiavone was conducting a property watch at the same residence and observed a white truck with a white male matching the said description from the earlier incident. They detained the subject who turned out to be [the Defendant]. They advised him of his Miranda rights and he stated that he understood and agreed to speak with the officers.

He stated that he was at the residence looking for a Ronnie Brown, his ex-brother-in-law. [The Defendant] stated that Ronnie had treated his sister-in-law terrible and Ronnie had killed approximately 200 people by exposing them to HPV and AIDS. He also stated that Brown had killed his mother in East Tennessee while she was in a nursing home.

He stated that he was at this residence yesterday to confront Ronnie and was armed with a Ruger .22 caliber pistol and shotgun. [The Defendant] did say that he shot both dogs because it was either him or the dogs. The responding officers asked if the dogs tried to bite him and he stated they just barked. He stated that he did go on the porch with a shotgun and knock on the door. He was stating that he was protecting himself from this said Ronnie Brown.

Responding officers asked if he had been to this residence before and he stated that he had. He stated that he parked his truck up the street and walked to the residence carrying a shotgun and pistol. He stated that he, again, was looking for Ronnie Brown.

The officers asked if [the Defendant] had any mental disorder or took any medication for mental disorders, and [the Defendant] said that he did not take any medication.

Based upon these facts, the trial court accepted the Defendant's guilty plea. The trial court ensured that the Defendant understood that he was to remain on his medication and not change it without a doctor's permission. It also ensured that all his weapons had been confiscated.

## B. Sentencing Hearing

At a subsequent sentencing hearing, the trial court recounted that the Defendant had pleaded guilty to three charges, one count of aggravated assault and two counts of animal cruelty, and that the agreed range of the sentence was three to six years, with the trial court to determine the length of the sentence and the manner of service. The State informed the trial court that, while the range was three to six years, the State had agreed to a five-year cap on the sentence as part of the plea agreement.

Detective David "Lance" Hampton with the Sumner County Sheriff's Office testified that he responded to this shooting on June 18, 2019, which involved the death of two canine family pets. After speaking with the victim, Detective Hampton employed the assistance of the Tennessee Bureau of Investigation ("TBI") to create a composite drawing to assist in identifying the Defendant. The detective released the drawing to the media, and the Sheriff's Office placed extra patrol on the property and began reviewing local surveillance camera footage and speaking with the neighbors. Included in the description with the drawing was that the male was driving a white truck.

An officer, Sergeant Schiavone, working the extra patrol, saw a white male in a white truck parked in the victim's driveway. He called it in to Detective Hampton, who arrived at the scene shortly thereafter and approached the Defendant, who was by then in the back of Sergeant Schiavone's patrol vehicle. The sergeant informed the detective that there were guns in the Defendant's truck.

As provided in the State's recitation of facts, the detective then offered the Defendant *Miranda* warnings, determined the Defendant's identity, and listened as the Defendant said he was looking for Ronnie Brown. The detective's recount of this interaction matched the State's summary.

Detective Hampton determined that Ronnie Brown had never resided at the address where the shooting occurred. The Defendant admitted that he had been at the residence the day before, and the Defendant admitted to shooting the two dogs. The Defendant said that he went to the front door with a shotgun and said he was beating on the door looking for Mr. Brown. The victim had said that she had seen the Defendant on her property with a rifle and a shotgun on May 7, 2019, so the detective asked the Defendant if he had been there before. The Defendant said that he had been there about a month before, parked down the road, and walked to the house with a rifle and a shotgun looking for Mr. Brown. He, however, had not made contact with anyone during the May incident. Detective Hampton said that, while a report had been made about the May incident, nothing further came of it.

4

In the Defendant's car, the detective found a shotgun and another gun. He did not locate the .22 caliber weapon that had been used to shoot the two dogs. When asked, the Defendant said that the .22 was at his residence in Robertson County. The detective obtained a search warrant for the Defendant's residence and was able to recover the weapon.

Detective Hampton relayed that he had spoken with a man named Johnny Morris, who said that, while he had not spoken with the Defendant in three years, the Defendant was a "very paranoid person." He said he never gave the Defendant permission to go hunting on his property.

During cross-examination, Detective Hampton testified that there was no motive for this confrontation and that the Defendant had no history with the victim or her family. Further, Mr. Brown was not connected to this property, and there was no evidence to support the Defendant's allegations about him, which were not credible. The detective said that multiple people he spoke with had concerns about the Defendant's mental state. The detective found the Defendant cooperative, saying that the Defendant spoke normally to him during the interview.

Upon questioning from the trial court, the detective said that, when he arrived at the scene of the shooting, one of the dogs was being transported to a veterinarian and another one was dead lying on the ground next to the driveway beside the porch. The victim was "very upset" and felt "threatened," but she spoke with the officers effectively. The detective found shell casings on the porch, indicating that the Defendant was on the porch when he fired his weapon.

The victim testified that she lived at the house where the shooting occurred, which sat on almost eleven acres, with her husband and four children. The family had four dogs, two bigger dogs, one an aging Bernese Mountain Dog with a bad hip and the other an Australian Shepherd, and two smaller dogs. On the morning of this shooting, the victim let out the two bigger dogs to the front area of her property. The back area was used as horse pasture. The dogs began barking, so she yelled at them to stop from her kitchen at the back of the house, noting that they sometimes barked at raccoons and possums.

The victim went out her back door and around to the side of the house where her vehicle was parked. The Australian Shepherd was barking in an unusual manner and looking at the back of her SUV. Thinking that it was likely a raccoon, the victim went around behind her vehicle and saw the Defendant crouched behind her vehicle with a weapon. The victim realized then that she had stepped between the Defendant and her dog, so the Defendant's weapon was aimed at her. She was "shocked," and said "what are you doing here?" The Defendant, who looked "fairly normal," responded incoherently and said something about coyotes. The victim told the Defendant that he had to leave her property. She then went inside and called 911. The victim and her daughter watched out the window

5

as the Defendant paced up and down the road in front of their house. He disappeared into the woods before the police arrived.

The victim did not see the Defendant between May 7 and June 18 when he returned. She described the June encounter, saying that she had taken her daughter to camp and was home alone. She let the dogs out and went to her bathroom. Shortly thereafter, she heard gunshots, barking, and then screaming. She looked out the window and saw the Defendant shooting her Australian Shepherd in the face, neck and chest.

The Defendant's truck was in the driveway near where he shot the dogs. After shooting the dogs, the Defendant walked casually back to his vehicle, opened the door, put his handgun in the car, and retrieved a long gun. The Defendant walked toward her porch with his long gun. The Defendant began pounding on the door with his gun. The victim ran toward the back of the house and found her large dog shot lying near her back French doors. She dragged the dog, who was still alive, inside, and then hid in a hole outside her home and called 911. The Defendant had again left by the time police arrived. That day, the TBI assisted her in creating a composite picture of the Defendant.

The victim then described how this incident had negatively affected her family.

During cross-examination, the victim said that the Defendant returned to her house June 19, when he was arrested. He had not returned to her home since that day. He had come within one mile of her home, and she had received breach notifications, but learned those were likely because he was driving nearby on a thoroughfare.

Upon questioning from the trial court, the victim said that the Defendant looked "evil and not right" on the day he shot her dogs. She said that he was trying to get into her home and kill someone. She believed she would be dead but for her dogs.

For the Defendant, James Douglas Brown testified that he was married to the Defendant's sister and had been for twenty-five years. His wife, Mrs. Brown, was a registered nurse and wanted to be present to testify but was suffering from medical ailments. Mr. Brown said that the Defendant suffered from mental problems, and Mrs. Brown spoke with the Defendant about this. Since being arrested, the Defendant had seen a psychiatric doctor who prescribed him medication, and the medication had changed the Defendant's demeanor for the better. Mr. Brown expressed his and Mrs. Brown's willingness to help and support the Defendant to the extent possible.

During cross-examination, Mr. Brown said the Defendant suffered from thinking that people were out to get him, including sometimes police officers. The Defendant did, however, have a good work track record, working for over forty years. He was unaware how many guns the Defendant owned. Mr. Brown said that the Defendant had moved to Columbia, where Mr. Brown and his wife also lived, and he lived by himself.

6

Upon questioning by the trial court, Mr. Brown said that the Defendant told him he hoped to get to the point he no longer needed the medication. Mrs. Brown told the Defendant he needed to always stay on his medication. Mr. Brown said that he was not related to Ronnie Brown, whom the Defendant originally said he aimed to shoot on the day in question.

The Defendant testified and said he went to the victim's home on May 7, June 18, and June 19. At that time, he was looking for "Ronnie Brown" who he believed had killed "a lot of people" by putting disease in their drinks. He believed that Ronnie Brown had killed his family members. The Defendant said that he went to Vanderbilt and got some help and no longer believed that Ronnie Brown was engaged in such behavior. He said that at the time of the shooting he was not thinking correctly. The Defendant said he was diagnosed at Vanderbilt, where he stayed for two weeks, with schizophrenia.

The Defendant testified that it was a bad decision for him to go to the victim's house. That day, he believed that the victim's dogs were a threat to him, but now he was "so sorry that [the shooting] happened." He said he was "out of [his] head." He would change the situation if he could and never have gone to the victim's house.

The Defendant agreed that his family had expressed concern about his mental status for years but that he refused help. Part of his mental illness made him believe he did not need help.

The Defendant recounted cooperating with the police when arrested and said he told them about Ronnie Brown. He understood now that his allegations seemed implausible. He stayed in jail for a duration of weeks, and, as soon as he was released, he sought treatment at Vanderbilt. After discharge, Vanderbilt doctors encouraged the Defendant to seek further treatment at Centerstone, which he did. He began going to appointments at Centerstone once per month, and in the two years since his release, he continued to have appointments there.

Centerstone had not changed his medications in the last two years, and the three medications that he took helped him to think more clearly. The Defendant said that, on the medicine, he no longer had delusions. He wanted to continue getting better.

The Defendant said he had moved to Columbia, which was one hour and thirty minutes from the location of the shooting. He said he had not tried to go near the victim or her home and understood he needed to stay far away from her permanently. The Defendant said that the victim had sued him civilly for damages related to these shooting.

The Defendant had no notable prior criminal history, had worked for the same employer for more than forty years, and was married for over twenty years. The Defendant

7

said that, since "bonding out" on these charges two years prior, he had not been arrested. In that time, he had maintained contact with his bonding company and the GPS monitoring organization, as required, not failing to report to either. The Defendant expressed remorse and asked for probation.

During cross-examination, the Defendant testified that someone had told him about a place to hunt coyotes in rural Coopertown. While there, he believed he saw Ronnie Brown's wrecker at the victim's house. He described Ronnie Brown as an average looking white male and agreed that the victim looked nothing like him.

Upon questioning by the trial court, the Defendant described his delusions saying that, for a period of thirty to forty years before he was on medication, he would remember things that happened and then later learn that they did not happen. The Defendant said that, before this event, he collected guns as a hobby and would reload his own ammunition and target shoot.

The Defendant said that he thought that Ronnie Brown had poisoned the Defendant's mother, and she died around "1922." When he did not seen Ronnie Brown at the house in May, he returned to see if he lived there. He said he went to look for him because "[i]t had been dwelling in [his] mind." When he saw the victim in May, he thought she may be Ronnie Brown's girlfriend, but he did not ask her at the time because he was scared and thought he should leave.

Based upon this evidence and the arguments of counsel, and in consideration of the nature of the criminal conduct, the mitigating and enhancement factors, and the Defendant's statements, the trial court sentenced the Defendant. In so doing, it stated:

> The first thing I do under the rule of law, I look at the range of sentence. And that's easy here. This [D]efendant has no record, and the range is a Range I sentence, and the ranges have been set out appropriately, three to six; one to two; and one to two.

> Enhanc[ement] factors, 40-35-114. I've got personal injuries inflicted upon, or the amount of damage to the property sustained or taken by [sic], the victim was particularly great. I mean, I know what it's like to have a dog. They become part of your family. I grew up with dogs all my life, and Ms. Spisak is in the same position. It's like losing two family members. Watching your family shot, killed, and die in your presence is a pretty big load to take and have to deal with and have to live with.

> Number 9, he possessed or employed a firearm during the commission of the offense and those are two-- the aggravated animal abuse counts.

Number 10, he had no hesitation about committing a crime when the risk to human life was high. In a driveway in front of a house in a neighborhood, it doesn't get any worse than that unless he's at a movie theater or at a mall or something similar to that.

Mitigating factors. I do find Number 8, he was suffering from a mental or physical condition that significantly reduced his culpability for the offense. There's no doubt here and we can't ignore the fact, looking through the records, he's got 30 years here of schizophrenic behavior, and it's obvious when he talks on the witness stand and talks about other things. He's very matter-of-fact, short sentences and to the point, no emotion, and I think his attitude or the way he conducts himself is manifested with that diagnosis.

Lastly, 13, he has no record, and I will consider that.

And as General Daugherty mentioned, I look at the *Carter* factors, 254 S.W.3d 335 and consider these enhanc[ement] and mitigating factors are just more or less tools. They are not the final say on whether I should put a sentence in a sentence range, and the *Carter* court held the imposition of a sentence justly deserved in relation to the seriousness of the offense.

So just how great should a sentence be when the defendant goes to the victim's house here, scares her half to death, doesn't know why he's in the driveway? She goes to the vehicle, he's pointing a gun somewhere, and she ends up in the sights of a gun with a man she's never seen before, not knowing if she's going to live or die. I can't imagine anything worse than that, but that's not the end of it.

He comes back a little over a month and he's seen shooting up the driveway and numerous shots are fired toward the residence at these dogs until they are killed. And the victim had to watch this, had to deal with it, had to try to secure her own safety and went to the only place that she knew where she could be safe. That condition's off the charts.

Secondly, a punishment sufficient to prevent crime and promote respect for the law. Well, there's no evidence of that condition being present in the actions of the [D]efendant on this particular date or dates because he goes back the next day and he's in the driveway and he's caught with all these weapons and he doesn't give a rip about shooting up the driveway or the house or the porch, and there's no . . prevention of crime in his mind or promoting respect for the law. What else is needed more than the safety of our neighborhoods and making our homes castles that protect us from evil? We have somebody like [the Defendant] coming up and not caring anything

9

about that and coming back repeated times without any kind of respect for what's right.

Lastly, consideration of his potential or lack of potential for rehabilitation. The jury's still out on that as far as I'm concerned. Relying on somebody to take their medication is a big deal, especially when we have the diagnosis from his mental health records.

So in considering all that, to me, there is no option. The sentence for the aggravated assault will be five years. The sentence for the two . . . aggravated animal cruelty cases will be two years.

Now, I've got to consider what to do. The first thing is consider judicial diversion at the request of the defendant. This is 40-35-313. And under *State v. Parker* I'm to consider numerous factors and go through each of them.

Number one, his amenability to correction. As I said, the jury is out on that. Relying on him to take his medication even when he doesn't want to do it, that's not a favorable factor.

The circumstances of the offense here are horrible, as bad as it gets, and the effect on [the victim] and her family will last more than this generation because of her daughter.

His criminal record is favorable; his social history neutral. Status of his physical and mental health, mental health is not good. It's unfavorable.

The deterrent value to the accused as well as others. How much deterrent effect is needed to prevent somebody from going to a complete stranger's house and scaring the living daylights out of them for three days, and part of those three days are two days in a row.

And, lastly – this one really, really comes to light – whether judicial diversion will serve the interests of the public as well as the accused. If diversion if granted here, we've got the possibility of this defendant owning a firearm. I never ever want to be in a position where this defendant will ever, ever have a firearm. That consideration of the interests of the public so far overrides everything else. It's hard to describe in human terms. 40-35-313 will be denied.

Now, as to the issue of what are we going to do with this sentence, [Defense Counsel] mentioned 40-35-103, sentencing considerations

10

involving confinement, and probation is an issue here, and we have kind of gone through these. Sentences involving confinement should be based on the following considerations:

One, is necessary to protect society by restraining a defendant who has a long history of criminal conduct. We don't have that.

(B) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others. As I stated, and I won't overdo it, the effect on the victim and her family here are something that cannot be calculated. The deterrent effect to others coming in neighborhoods firing ten rounds, whether it's at dogs, whether it's at humans or whether you're just shooting up in the air, that is something that will scare the living daylights out of any normal human being.

Again, our country is founded on the principle that we have been endowed by our Creator, God Almighty, with certain rights, unalienable rights. Among them are life and liberty and the pursuit of happiness. And if the government cannot consider the safety of the public and punishment for these kind[s] of things, then we are in a serous bind. That must be considered, and that is a primary point that influences me in this decision.

(C), measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. So that is not particularly relevant in this particular case.

We have the fact that we must avoid depreciating the seriousness of the offense, and we've got to consider the deterrent effect. So probation will not be . . . complete probation will not be ordered here. There will be jail time.

And I have considered what I think would be served in TDOC and then coming out on parole. I've weighed the options of having a bureaucracy such as the parole board and parole officers supervising this [D]efendant for the rest of a sentence in the TDOC and not being able to rest comfortably. So I'm going to impose a sentence where I retain considerable control over this [D]efendant.

These sentences will run concurrently with each other, but they will be suspended after 11/29 at 100 percent in the Sumner County jail beginning today. Probation will be for 12 years. That's the maximum period of time that the [D]efendant will be eligible for. So under the law he can be put on

11

probation for 12 years now. Instead of having that supervision under the department of parole, he's going to be under my jurisdiction for 12 years, and he must attend aftercare at Cornerstone, and I'll let him be furloughed one day a month while he's in jail to go to treatment. He has somebody pick him up, take him, and bring him back one time a month, and he's got to continue that after he is released from jail.

He cannot – he absolutely cannot leave Maury County after he's on probation unless there are medical reasons. And he must . . . report every month, and he must provide the probation officer every month with a list of the medications that he takes every day. If he does not take his medications as prescribed, then there will be a probation violation warrant obtained and we'll consider sending him to the penitentiary for the remainder of this time which probably would not be much more, if anything.

Lastly, I order restitution to [the victim] in the amount of $1200 for the two dogs. That needs to be made within two years after his release from jail as a condition of probation.

The judgment forms indicate that the trial court sentenced the Defendant to a five-year sentence with 364 days to be served in jail. In the alternative sentence section, the judgments ordered twelve years of probation. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court improperly sentenced him to a sentence of five years plus twelve years of probation when his plea agreement capped his sentence at five years and that the trial court improperly imposed as a special condition of his probation that he not be allowed to leave Maury County during the twelve years of probation except for medical reasons. The State counters that the Defendant has waived review for failing to object to the conditions of probation at the sentencing hearing. After review, we conclude the Defendant is entitled to relief.

## A. Plain Error

The State contends that the Defendant's failure to object to the duration and conditions of his probation at the conclusion of sentencing constituted a waiver of objection, constraining our review to that pursuant to the plain error doctrine. We respectfully disagree.

As the Defendant's attorneys note, there is no rule in Criminal Procedure requiring that a defendant object to the duration or conditions of his probation after being sentenced

to be entitled to an appeal.  To hold otherwise would be contrary to our current system of reviewing sentences in criminal cases, as this court frequently reviews a defendant's sentence without his or her objection to that sentence before the trial court.

Tennessee Code Annotated section 40-35-401 (2019) states that:

(a) The defendant in a criminal case may appeal from the length, range or the manner of service of the sentence imposed by the sentencing court. The defendant may also appeal the imposition of consecutive sentences. An appeal pursuant to this section shall be taken within the same time and in the same manner as other appeals in criminal cases. If there is an appeal of the conviction, the appeal of the sentence shall be taken at the same time. There is no appellate review of the sentence in a post[-]conviction or habeas corpus proceeding.

(b) An appeal from a sentence may be on one (1) or more of the following grounds:

(1) The sentence was not imposed in accordance with this chapter;
(2) The sentence is excessive under the sentencing considerations set out in §§ 40-35-103 and 40-35-210; or
(3) The sentence is inconsistent with the purposes of sentencing set out in §§ 40-35-102 and 40-35-103.

According to Tennessee Rule of Appellate Procedure 3(b)(2), a defendant who enters into a plea agreement has a right to have review of the sentence on appeal, if there was not a plea agreement concerning the sentence, or review of any issues that "were not waived as a matter of law by the plea of guilty . . . and if such issues are apparent from the record of the proceedings already had."  Tennessee Rule of Criminal Procedure 37(b)(2) further provides for appellate review of issues stemming from a guilty plea by providing that:

An appeal lies from any order or judgment in a criminal proceeding where the law provides for such appeal, and from any judgment of conviction . . . [u]pon a plea of guilty or nolo contendere if: (i) [t]he defendant entered into a plea agreement under Rule 11(e) but explicitly reserved with the consent of the state and of the court the right to appeal a certified question of law that is dispositive of the case . . . ; or (ii) [t]he defendant seeks review of the sentence set and there was no plea agreement under Rule 11(e); or (iii) [t]he error(s) complained of were not waived as a matter of law by the plea of guilty or nolo contendere, or otherwise waived, and if such errors are apparent from the record of the proceedings already had . . . .

13

Nowhere in our rules is a defendant required to object to preserve his right to appeal his sentence. Accordingly, we conclude that we are not constrained to plain error review.

## B. Sentencing

It is well settled that this court reviews within-range sentences and alternative sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W. 3d 682, 707 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Once the trial court has determined the appropriate sentencing range, it "is free to select any sentence within the applicable range." *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (citing T.C.A. § 40-35-210(d)). When determining a defendant's sentence and the appropriate combination of sentencing alternatives, trial courts are to consider the following factors:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court must state on the record the statutory factors it considered and the reasons for the ordered sentence. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 705-06. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence, however, should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. A trial court's sentence "should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10.

The 2005 revised sentencing statutes advise that a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6). However, no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant bears the burden of proving his or her suitability for alternative sentencing options. *Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-303(b)). The defendant must show that the alternative sentencing option

14

imposed "will subserve the ends of justice and the best interests of both the public and the defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000).

Before imposing a sentence of full confinement, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103 (1)(A)-(C). In addition, the sentence imposed should be (1) "no greater than that deserved for the offense committed," and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), -103(4). Furthermore, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). The party appealing a sentence bears the burden of establishing that the sentence was improper. Id. § 40-35-401, *Sentencing Comm'n Cmts*.

The Sentencing Act provides that "the trial court has great latitude in formulating punishment, including the imposition of conditions on probation." *State v. Burdin*, 924 S.W.2d 82, 85 (Tenn. 1996). The primary purpose of probation sentence, however, "is rehabilitation of the defendant," *id*. at 86, and the conditions of probation must be suited to this purpose. "Once the trial judge determines that probation is justified under the circumstances, the conditions imposed must be reasonable and realistic and must not be so stringent as to be harsh, oppressive or palpably unjust." *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). The Act does not grant to the trial court "unfettered authority" to impose any condition on the defendant's probation but limits the court's discretion to "the bounds of traditional notions of rehabilitation." *Burdin*, 924 S.W.2d at 87; *see also State v. Mathes*, 114 S.W.3d 915, 918 (Tenn. 2003) (disapproving a probation condition that did "not serve either the goal of rehabilitation or the goal of deterrence); *State v. Robinson*, 139 S.W.3d 661, 666 (Tenn. Crim. App. 2004). That being said, however, the burden of demonstrating the impropriety of a probation condition rests with the defendant. *Burdin*, 924 S.W.2d at 84.

## 1. Duration of Probation

The first issue we address is whether the trial court erred when it sentenced the Defendant to twelve years of probation, rather than the agreed-to sentence of five years. The Defendant cites to *State v. Raymond Brandon Saffles*, E2020-01116-CCA-R3-CD, 2021 WL 4075030, at *6 (Tenn. Crim. App., at Knoxville, Sept. 8, 2021), *no Tenn. R. App. P. 11 application filed*, for the proposition that it is reversible error for a trial court to sentence a defendant to a term that exceeds the sentence term agreed to in the plea agreement. The State attempts to distinguish *Saffles*.

In *Saffles*, the defendant therein pleaded guilty in exchange for a six-year sentence, with the trial court to determine total restitution and payment amount. At a subsequent hearing, the trial court sentenced the defendant to 364 days in jail followed by six years of probation, for a total effective sentence of seven years. This court held:

> Once a plea agreement is approved by the trial court, it becomes a binding and enforceable contract. *See State v. Howington*, 907 S.W.2d 403, 407 (Tenn. 1995); *see* Tenn. R. Crim. P. 11(c)(4) ("If the court accepts the plea agreement, the court shall advise the defendant that it will embody in the judgment and sentence the disposition provided in the plea agreement."). Pursuant to the Defendant's plea agreement, the only item to be determined by the trial court was the amount of restitution and payment schedule. Therefore, when the trial court accepted the Defendant's guilty plea, it was bound by all of the terms of the plea agreement, including the length of the sentence and the amount of time spent on supervised probation.

As stated by the court, the plea agreement in this case, since it was approved by the trial court, was a binding and enforceable contract. The State argues:

> Here, the plea agreement provided a possible period of capped incarceration of five years, with "manner of service" to be determined by the trial court. The [D]efendant got what he bargained for, a five year sentence. If the [D]efendant thought the plea agreement meant only a total maximum sentence, incarceration and probationary, of five years, he no doubt would have spoken up at the sentencing. The probation statute is clear that probation, e.g. "manner of service," can exceed the sentence imposed.

We respectfully disagree with this line of reasoning. This Defendant, who by all accounts suffers from mental illness, was told by the trial court during a plea colloquy that the pleas he was entering and the agreed-to sentence was "capped" at five years. While the trial court was to determine the "manner of service," the Defendant would be reasonably entitled to assume that the trial court's sentencing determinations would all fall within the five-year time frame. By its plain meaning, the term, "manner of service" means incarceration, probation, or split confinement. The term does not by its plain meaning mean extension of the duration of the sentence agreed to by seven years. To allow

16

defendants to be sentenced to restrictive terms of probation years beyond an "agreed to" sentence length, negotiated by the attorneys and approved by the trial court, would be totally improper.

As such, we conclude that the trial court erred when it sentenced the Defendant to a term of probation beyond the five-year term that the parties agreed to in the binding and enforceable plea agreement.

## 2. Travel Restrictions

The Defendant next contends that the trial court erred when it included as a condition of his probation that he not leave Maury County while serving his probation.

Tennessee Code Annotated section 40-35-303(d) permits trial courts to impose conditions of probation that are "reasonably related to the purpose of the offender's sentence and not unduly restrictive of the offender's liberty, or incompatible with the offender's freedom of conscience[.]" *Mathes*, 114 S.W.3d at 918, *see also* T.C.A. § 40-35-303(d)(9). It is the Defendant's burden to demonstrate the impropriety of a probation condition. *Burdin*, 924 S.W.2d at 84.

While a case of first impression in Tennessee, we first note that federal statutes codify that that there are situations and cases in which it is justified to require a defendant to remain in a jurisdiction except when granted permission to leave by the court or his or her probation officer. *See* 18 U.S.C.A. § 3563(b)(14). In a Colorado case, a geographical restriction imposed as a condition of probation in an assault case, which prohibited a defendant from being found in the area where the victim lived, was reasonably related to the underlying offense, the condition was designed to prevent the possibility of physical contact between the defendant and the victim for a period of probation, and the defendant neither lived nor worked in the area covered by restriction. *People v. Brockelman*, 933 P.2d 1315 (Colo. 1997), *reh'g denied,* (Apr. 14, 1997). In a California case, the appellate court found it was not unreasonable or an unconstitutional violation of the defendant's right to travel to have as a probation condition that the defendant must maintain a distance of at least fifty yards from the victim's home. *People v. Petty*, 213 Cal. App. 4th 1410, 154 Cal. Rptr. 3d 75 (1st Dist. 2013). In that case, the victim had known defendant for years, defendant admitted to returning to victim's home on several later occasions uninvited, intrusion on defendant's travel was minimal, and forbidden zone was specifically linked to his past crime. *Id.*

In all travel restrictions, as with other conditions of probation, they must be reasonably related to the purpose of the defendant's sentence. In this case, we conclude that the travel restriction requiring that the Defendant not leave his county of residence for a period of twelve years is overly broad and not reasonably related to the purpose of his sentence and is unduly restrictive.

17

Tennessee Code Annotated section 40-35-401(c) (2019) specifies how the appellate court may proceed when a defendant appeals his sentence, providing that if a sentence is appealed, the appellate court may:

1. Dismiss the appeal;
2. Affirm, reduce, vacate or set aside the sentence imposed;
3. Remand the case or direct the entry of an appropriate sentence or order; or
4. Direct any further proceedings appropriate or required under the circumstances.

In the interest of judicial economy and in accordance with our holdings, we remand the case to the trial court with direction for the trial court to enter amended judgments that reflect the following: the Defendant be sentenced to a term 364 days of incarceration followed by four years and one day of probation, for a total term of five years, as agreed to by the parties. We further include as a condition of probation that he not knowingly go within fifty miles of the victim or her residence, except as required by any pending civil litigation, and that he willingly leave were he to unwittingly encounter her or her family. We agree with the trial court that a condition of the Defendant's probation shall be that he remain on his medication and that, as a felon, he not own or attempt to possess a firearm.

We recognize that, if the Defendant were to violate his probation, the trial court could extend his term of probation and or change the conditions of his probation. *See State v. Brandon L. Brawner*, No. W2013-01144-CCA-R3-CD, 2014 WL 465743, at *2 (Tenn. Crim. App. Feb. 4, 2014), *no perm. app. filed* (citing T.C.A. §§ 40-35-308(a), (c), -310, -311(e)(1); *State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999)) (stating that upon finding that a defendant has violated the conditions of probation, the trial court is statutorily authorized to: "(1) order confinement; (2) order execution of the sentence as originally entered; (3) return the Defendant to probation on appropriate modified conditions; or (4) extend the defendant's probationary period by up to two years.").

### III. Conclusion

Based on the foregoing reasoning and authorities, we reverse the trial court's judgments, and we remand the case for entry of amended judgments in accordance with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE

18